[Crim. No. 3109. Second Appellate District, Division One.—September 20, 1938.]

THE PEOPLE, Respondent, v. GEORGE RABALETE, Appellant.

Henry G. Bodkin and Louis G. Guernsey for Appellant.

U. S. Webb, Attorney-General, and Warner I. Praul, Deputy Attorney-General, for Respondent.

WHITE, J.—In an amended information containing two counts appellant was charged with violations of subdivisions 2 and 3 of section 337a of the Penal Code, which section denounces as a crime the maintenance or occupancy of a place for the purpose of recording or registering bets on horse races; or the receiving, holding or forwarding of bets or wagers upon such contests. Trial had before the court sitting without a jury resulted in the conviction of appellant on both counts. This is an appeal from the judgments and from the order denying appellant's motion for a new trial.

The factual background of the prosecution's case was supplied in the main by the testimony of police officer M. Stuart Jones, who in substance testified that he had been employed in the vice division of the Los Angeles city police department since February of 1937, and that for some three months he had devoted himself exclusively to investigating bookmaking establishments and was familiar with the routine procedure and machinery of these establishments. On the third of January, 1938, the officer went to the Douglas Building, 255 South Spring Street, in the city of Los Angeles, about 1 o'clock in the afternoon. At this address the defendant maintains a large bookstore on the ground floor of the building, with approximately one hundred feet of open frontage upon the street. There the officer saw the defendant and several others behind the counter making notations on paper and taking money from different people. While the officer was talking to a man behind the counter he heard the defendant, five or six feet from him, in conversation with another unidentified man, utter the following words: "242 to show." At the same time the defendant was handed some paper money which to the witness looked like a dollar bill. After this statement was made the defendant, according to the witness, made a notation on a slip of paper, turned directly about, walked about six feet to a shelf, took down a book and placed the slip of paper therein. The book to which refer-

ence was made was volume II of "World's Popular Encyclopedia", and was identified by the witness at the trial as being the book in which the slip was placed by the defendant, after which the book was received in evidence. Certain slips of paper were found in this book which were also received in evidence. The police officer testified that in connection with his official duties as an investigator of bookmaking establishments, he had theretofore seen slips of paper similar to the ones taken from the book, and that they were commonly called "betting markers" and were used for the purpose of recording bets on race horses. The witness also stated that the letters A, B and C, which appeared on these "markers" were used to indicate respectively bets placed on the winner of the race; the horse to come in second in the race; and the horse to come in third. On the counter in the store, about eight feet from where the books were, there was found a back sheet of a racing form which bore the date, January 3, 1938. This form purported to contain the names of entries of horses, races, the post times of races, and other information relating to them. At the trial the officer compared the number 242 appearing on the "marker" numbered exhibit 1 with the racing form received as People's exhibit 8, and found that this number appeared opposite the name of a horse, "Ladino", which was to race at the New Orleans Fair Grounds on January 3d. The witness also testified that the markings on exhibit 1 indicated that one dollar had been bet on this horse to come in third. In this connection it should here be remembered, however, that the evidence clearly showed that none of the markings upon these exhibits or betting slips were in the handwriting of the defendant, although the officer testified he saw the defendant writing something upon one of the slips or markers and place the same in the book. It was also testified by the officer that he personally attempted to place a bet on a horse with the defendant, but the latter refused to accept the bet, the officer's testimony in this connection being as follows: "He said that he (the defendant) didn't know me and I would have to get somebody to know me, that knew me, that he couldn't take my bet."

Following this last-mentioned episode, the officer went out upon the sidewalk and around the corner of the building, where he received a signal from a fellow officer; whereupon

both policemen reentered the store, at which time, the testimony indicates, somebody said ''Cops!'' and everyone made a hasty retreat, with the exception of the defendant, who was the owner of the store. Upon the person of the defendant was found the sum of $192, and when the arrest was made a search of the premises revealed numerous sheets, called ''National Scratch Sheets''; also a full pad of slips similar to those received in evidence. The ''National Scratch Sheets'' were so-called ''tip sheets'' which are sold at newsstands and contain the entries, names and numbers of horses and recommendations of favorites in various horse races.

■■■ Appellant first challenges the validity of the conviction under count 1 of the amended information on the ground that the trial court fell into error in admitting into evidence a fragmentary part of a conversation had between appellant and an unidentified man, and which words, it is contended by appellant, constitute the only evidence from which his guilt could be inferred. As heretofore stated, the conversation occurred when the officer first entered the store, when, according to the officer, he observed appellant ''take his pencil and mark on paper and repeat, '242 to show'. That is all the conversation I got.'' The officer then testified with reference to the conduct of the defendant in placing the slip upon which he had written in a book as hereinbefore set forth. Defendant's objection to the introduction into evidence of the three words uttered by him was overruled and his motion to strike the same was denied.

The importance of this ruling becomes at once apparent, because it was conceded at the trial that when the book into which the officer testified the defendant placed the slip upon which he had written was seized and examined, none of the racing paraphernalia in the form of betting markers or slips abstracted from the book bore any of defendant's handwriting. Therefore, to connect defendant with the taking of a bet, his guilt must be predicated upon the assumption that the words uttered by him, ''242 to show'', indicated the taking by him of a bet upon a horse race which it was proved at the trial was being that day run at New Orleans, and in which race a horse named Ladino, bearing number 242, was running. While it is true that some slips, forms and other paraphernalia common to establishments maintained for the

reception of bets on horse races were found at the book store, the evidentiary value, if any, of such paraphernalia was in our opinion correctly appraised by the court in the following language addressed to the district attorney:

" . . . But you have not connected the defendant with them. The mere fact that he has a large book store with a large number of books in it and you find several books segregated in one place and you find something in one of those books, unless you can find defendant had something to do with it or he at least knew it was there, I don't see how you tie him up with it. I might go to my chambers and find volume 146, California Reports, and find in it the result of the last race somewhere, and I would hate to be tied up with that if I didn't put it there.

"Mr. Richardson (Deputy District Attorney): Don't you think the circumstance he was, according to the testimony of the officer, actually accepting a bet on a certain horse race connects these exhibits up?

"The Court: No, I don't think that is sufficient.

"Mr. Richardson: Because it is a necessary part of the business to have information when a race starts and the odds paid on it.

"The Court: I may be able to deduce that, but you have got to prove those things. I can't speculate. I can assume, if I start out on the assumption that the person has a bookmaking establishment or is accepting bets commercially, that he has some means of finding out when the races have been run and how the horses placed; but the fact that there are some figures in a store showing how a certain race came out—why, maybe one of the other clerks was playing these races on his own and he might have put these in. . . . "

There being no connection shown between the defendant and the betting markers and other paraphernalia, the trial court erred in admitting into evidence the scrap of a conversation, namely, the words "242 to show", because these words admittedly did not constitute the entire conversation, but consisted only of one phrase used by defendant in the course of a conversation not with the officer, but with a third person whose utterances were unheard by the officer. Clearly the question of whether this phrase was evidence of an incriminating nature or an innocent statement depends upon

what was said to the defendant by the other party, and that the witness did not hear. One might strongly suspect, in view of all the facts and circumstances here present, that the unidentified stranger said, "I would like to place a bet on 242 to show," and handed the defendant some money, whereupon defendant replied in the aforesaid language, namely, "242 to show"; but mere suspicion, however strong, as to what the entire conversation would have shown if it had been heard by the officer, is not sufficient to warrant the admission of a fragmentary part thereof. To justify the admission into evidence of a part of scrap of a conversation, enough of the conversation must be testified to as gives the hearer thereof an intelligent understanding of what was actually said. Here it is certain that the witness heard nothing of what the unidentified stranger said to the defendant, and how important the portion not heard may have been in determining innocent or culpable conduct on the part of appellant we cannot know. So far as we can tell it might, if heard even in part, have relieved the appellant of any incriminating consequences. This is especially true when it was conceded by both the People and the defendant at the trial that none of the betting markers found in the books contained even a single number, letter or word in the handwriting of appellant, and yet the officer testified that practically simultaneously with the utterance by defendant of the phrase, "242 to show", he wrote something on the "marker" which he placed in one of the books. If such a "marker" had been found in either of the books, bearing some of appellant's handwriting, it might have supplied the necessary foundation for the admission into evidence of the aforementioned phrase, because of the testimony of the officer with reference to what the handwriting upon the "markers" meant in betting or racing parlance. While it is true that it is the occupancy of a room with paraphernalia for the purpose of recording bets, not the actual making of bets, which constitutes the offense denounced by subdivision 2 of section 337a of the Penal Code, as charged in count 1, nevertheless some causal connection must be shown between the paraphernalia found upon the premises and the defendant, before a conviction can be sustained. If in the instant case it were shown that after appellant had stated, "242 to

show'', he wrote something on a piece of paper used in connection with the business of bookmaking and put it in a book where other racing ''markers'' were found, then a connection would be established between the defendant and the racing paraphernalia which would justify an inference that he knowingly occupied and kept a place with books, papers, devices, paraphernalia, etc., for the purpose of recording or registering bets. But in the instant case none of the markers taken from the books contained anything in defendant's handwriting or indicated in any way that he ever had the same in his possession or knew of their existence. In fact, the trial judge expressed himself as willing to make a finding of fact for the record that none of the handwriting on the betting ''markers'' was that of the defendant. Further, the presence of the ''markers'', racing form charts and other documents found in the store is not incompatible with defendant's innocence, when we remember that the bookstore operated by defendant had an open frontage of one hundred feet upon the ground floor, and that defendant had five clerks working for him, all of whom had access to all parts of the store and its fixtures. There is no evidence here that the bookstore in question was not operated as a *bona fide* mercantile establishment.

Eliminating the fragmentary part of the conversation as the court should have done, the evidence falls short of that substantiality required to warrant a conviction as to count 1, and the judgment rendered thereon must be reversed.

The gravamen of count 2 is the receiving, holding, or forwarding a bet to be staked or bet on the result of a horse race or purported horse race. The only direct evidence we find in the record upon which a conviction under count 2 can be predicated is the following testimony by officer Jones:

''Q. (By Mr. Richardson, Deputy District Attorney): What did you hear this other man say to the defendant? A. He said '242—$1.00, 242, to show.' . . .

''The Court: Who said it? . . .

''A. The defendant, Rabalete, stated, 'No. 242 to show.'

''Mr. MacKay (defendant's counsel): There wasn't anything about a dollar there?

''A. That is right.

"Mr. MacKay: I knew you made that mistake. I was going to check that after we got this motion ruled on.

"The Court: Let us clarify this situation. What did you mean by this dollar business you said in your direct examination?

"A. I evidently got this mixed up with—there may have been several book places since then, and I have it here in my notebook.

"Q. Let us get it right.

"A. The defendant said, '242 to show.' That's what he said. . . ."

It is apparent from the foregoing testimony that there was no evidence whatsoever to show that any money was taken or received by appellant for the purpose of making a bet, nor was there any evidence to show that the defendant made any record or notation of any bet, or received or forwarded a bet to be staked upon any actual or purported horse race. Much of what we have said in disposing of count 1 is pertinent to the conviction obtained upon count 2. The trial judge having found as a fact that none of the "markers" upon which bets were recorded was in appellant's handwriting, and the phrase "242 to show" uttered by appellant being but a scrap or fragmentary part of a conversation and therefore inadmissible, we find nothing in the record tending to prove the material allegations of count 2 unless we resort to suspicion founded upon the presence in the bookstore operated by appellant of certain form charts and racing paraphernalia with which no direct connection with defendant was established. It is a fundamental rule of criminal procedure that in the trial of an action wherein the defendant is charged with the commission of a crime the prosecution is required to prove every material element of the offense beyond a reasonable doubt. In this respect there is a marked difference between the degree of proof which is thus required and that which is imposed upon a plaintiff in a civil action. (Sec. 2061, subd. 5, Code Civ. Proc.) In the latter all that is required is that the affirmative allegations requisite to the cause of action stated by the plaintiff's complaint shall be established by a mere preponderance of the evidence. The material elements of the offense charged in count 2 are that the appellant received, held or forwarded the sum of one

dollar to be staked or bet on the result of a horse race or purported horse race; and the evidence offered in support thereof falls far short of that *quantum* of proof required to establish the guilt of appellant to a moral certainty and beyond a reasonable doubt.

In view of the foregoing, other points raised do not require consideration.

For the reasons stated, the judgments and the order by which defendant's motion for a new trial was denied are, and each of them is, reversed.

York, P. J., and Doran, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 20, 1938.