[Crim. No. 3703. Second Dist., Div. Three. July 30, 1943.]

THE PEOPLE, Respondent, v. SAM D'ANGELO,
Appellant.

Max M. Solomon for Appellant.

Robert W. Kenny, Attorney General, and Eugene M. Elson, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was accused of the crime of violation of section 337a, subdivision 2, of the Penal Code, in that he kept and occupied certain premises in Los Angeles with books, papers, and paraphernalia for the purpose of recording bets upon the results of horse races. It was also alleged in the information that defendant had been convicted previously in Pennsylvania of the crime of "breaking and entering with intent to commit larceny, a felony," and he had served a term of imprisonment therefor in the state prison. He pleaded not guilty, and denied the prior conviction. Trial by jury was waived. The court adjudged that defendant was guilty, and that the charge of prior conviction was true; and sentenced him to imprisonment in the county jail for 30 days. He appeals from the judgment and the order denying his motion for a new trial. His contention is that the evidence was not sufficient to support the judgment.

The case was submitted to the trial court, upon the transcript of the preliminary hearing, with a stipulation that police officer Jenkins, a witness at that hearing was qualified as "an expert on bookmaking matters"; and upon the testimony of the defendant at the trial. That transcript showed that police officer Conly testified as follows: He went into a beer parlor in Los Angeles, known as the Village Cafe, on December 2, 1942 (the day before the arrest), about 2:45 p.m., and from a place near the entrance he observed defendant standing at the "far end" of the bar, which was 30 or

35 feet .in length. Six or seven men at the other end of the bar, who were looking at scratch sheets, made notations on "a slip" of paper, called defendant over, and gave the slip of paper to him. On three occasions, during the 30 minutes the witness was there drinking two bottles of beer, he saw those men hand money to defendant, and saw defendant go into a back room and come out of that room after he had been in there about one-half of a minute. On the next day, December 3rd, about 3 p.m., he (witness) went into the same place again and saw "these men" sitting at the bar, looking at scratch sheets. He also saw one of the men, whose name was Frakes, make notations on a pad of paper on three occasions, call defendant over, talk to defendant a minute, and then give defendant a slip of paper, some currency and silver. On those occasions he saw defendant write on a pad and immediately go into the back room. Defendant came out of the back room after 7 or 8 minutes. He also saw another man make notations on a pad, call defendant over, and give money to him; and on that occasion he saw defendant "go with the slip of paper" into the back room, and come out again. In about 10 minutes thereafter, Frakes made notations on a pad, while looking at a scratch sheet, and called the defendant over after making the notations and gave him some money. On that occasion defendant took the slip of paper and went into the back room again. Then he (witness) went out and signaled to police officer Jenkins. When the witness saw the other officer coming, he returned to the cafe and went back to the place where "these men" were with the scratch sheets and where one of them was making notations on a scratch sheet. Just as the other officer entered the door the defendant looked toward the other officer, turned to Frakes and said, "Nix, nix." Frakes immediately put a pencil in his pocket, and about that time the other officer took the scratch sheet from Frakes. He saw some of the other men writing on slips also. He saw defendant serve drinks to persons in the cafe on December 3rd. He saw defendant write on the pads of paper, tear off the top sheet, put the pads back on the bar in front of the men sitting there, and then go into the back room. He did not see what defendant wrote on the pads. The way to the lavatory was through that back room.

The transcript of the preliminary hearing showed that police officer Jenkins testified in substance as follows: On

December 3, 1942, officer Conly entered the place referred to approximately 25 feet ahead of him, went to the bar, and stood by Frakes who was sitting at the bar. Defendant was standing on the inside of the bar in front of Frakes. When he (witness) was about 5 feet within the place, defendant looked at the witness and then turned toward Frakes. He (witness) went to the end of the counter where the National Scratch Sheet referred to as exhibit B, was on the counter under Frakes' hand and in front of defendant. The witness pulled the scratch sheet from under Frakes' hand and took two pads, referred to as exhibit A, which were on the counter. Officer Conly reached under the bar in front of a man who was sitting next to Frakes, "pulled out" the Metropolitan Scratch Sheet, and put it on the counter. He found a certain group of papers, referred to as a part of exhibit C, in a beer carton (the other part of exhibit C) in the back room. The cover of the carton was down and another carton was on top of it. A Metropolitan Scratch Sheet, dated December 2, 1942, and another group of small slips of paper, referred to as exhibit D, were found also in that carton. A Metropolitan Scratch Sheet, dated December 1, 1942, and another group of papers, referred to as exhibit E, were found also by him in that carton. An envelope containing certain papers, referred to as exhibit F, were found also in that carton. One of the pieces of paper found in exhibit C which had upon it the figure 6 followed by the words, "Paula's Lulu," and the figure 7 followed by the words, "Rock Hesive," and "X-1-X" in parenthesis, was a betting marker. That his opinion was that "Paula's Lulu" was the name of a horse running in the sixth race at Bay Meadows, parlayed to a horse named "Rock Hesive" running in the seventh race at Bay Meadows; that the figure "X-1-X" indicated nothing to win, one to place, and nothing to show; that the words, "Big Fred," at the bottom of the paper was the bettor. He compared the letters and figures on that paper with the scratch sheet dated the day of the arrest, and found that the two names thereon appeared on the scratch sheet as names of horses in the sixth and seventh races at Bay Meadows. He checked the rest of the slips of paper in exhibit C and found that the names thereon appeared on the National and Metropolitan scratch sheets of December 3rd, the day of the arrest. He examined some of the slips of paper in exhibit D and found that the names thereon were on the scratch sheet

for December 2nd. He examined the slips of paper in exhibit E and found that the names thereon were on the scratch sheet for December 1st. That in the business of bookmaking, papers such as exhibits A and F were called betting paraphernalia, scratch sheets, and betting markers. The radio was in operation when he was there and he heard a broadcast that gave results of a race at Bay Meadows. He asked defendant how much rent he paid at that place and defendant said $80 a month. He also asked defendant "if he phoned those bets he took in to anyone else?" Defendant said he did not, that he kept them himself and, "Give me a break—it will ruin my business." He said to defendant that it appeared that defendant had done a good business as far as bookmaking was concerned, and defendant said, "Well, that is only the proceeds for the last three days." When he asked defendant about the loose slips in the box, he said that was "the business for the day." Defendant also said the place belonged to his sister and "he just managed the place." He did not see defendant put anything in the carton. Frakes was arrested also. He (witness) did not hear a telephone ring while he was there. That the way to the lavatory was through that back room.

An exemplified copy of the record of the alleged prior conviction of defendant was received in evidence. Defendant submitted that issue without presenting any evidence thereon.

Defendant did not testify at the preliminary hearing, but he testified in the superior court in substance as follows: that he was a bartender; that at the time of his arrest he was back of the bar putting beer bottles in a case; that he did not take any wagers from any people in the bar that afternoon; that the bar was not owned by him; that he was an employee there; that he was not a bookmaker; that the betting markers found in the back room were not his; that he did not have any idea who put them there; that the writing on one of those betting markers found in the back room might have been written by him; that he, himself, made several bets with a man on the corner that day and he (defendant) kept a record of those bets.

It was stipulated that some of the betting markers found in the rear room were in his handwriting.

Defendant's argument is that the elements of the crime

were not proved; that it was not proved that he was occupying the premises for the purposes denounced by section 337a, subdivision 2, of the Penal Code; that the betting markers were found in a rear room which was accessible to defendant and the patrons; that defendant was an employee; and that no betting markers were found on defendant's person or in his possession. No contention was made that the papers found in the carton in the rear room were not papers and paraphernalia for the purpose of recording bets on horse races.

▆▆▆ Scratch sheets and pads of papers were on the counter where defendant and several of the patrons had transactions. Money and slips of paper were passed on several occasions from the men at the counter to defendant after the men had made notations on the pads of paper and called defendant to them, and defendant went immediately thereafter to the rear room with the slips of paper which had been handed to him by the men. Several scratch sheets and betting markers, some of which had defendant's handwriting upon them, were concealed in a carton in a rear room of the premises and defendant said he had no idea who had put them there. Names on the betting markers were the same as names of horses running in the races at the Bay Meadows track on the day of the arrest, and on the two preceding days. The results of the Bay Meadows races were received by radio in the bar soon after the arrest. Defendant showed consciousness of guilt when he said, "Nix, nix," to Frakes, who was writing on the scratch sheet as the officer Jenkins entered the place, and when he asked the officer for a "break." His statement, in referring to his arrest, "It will ruin by business," indicated that he was occupying the premises to conduct a business which belonged to him.

It is the keeping or occupancy of a room or place with papers, or paraphernalia for the purpose of recording bets on horse races, among other kinds of contests, that is denounced by subdivision 2 of said section 337a. (*People* v. *Manning,* (1940) 37 Cal.App.2d 41, 43 [98 P.2d 748] ; *People* v. *Hinkle,* (1923) 64 Cal.App. 375, 380 [221 P. 693].) ▆▆▆ Although it was incumbent upon the prosecution to prove that the place was kept or occupied for the purpose set forth in said subdivision 2, it was not necessary to make that proof by direct evidence. (*People* v. *Tuttle,* (1938) 27 Cal.App.2d 647, 649 [81 P.2d 571].) The purpose in keeping the place could be determined from the surrounding circumstances shown in

evidence. (*People* v. *Tepper*, (1940) 36 Cal.App.2d 525, 527 [97 P.2d 1002].) If the circumstances shown in evidence reasonably justify the finding of guilt by the trial court, a reviewing court is not warranted in disturbing the finding. (*People* v. *Newland*, (1940) 15 Cal.2d 678, 681 [104 P.2d 778].) (See also: *People* v. *Vertlieb*, (1943) 22 Cal.2d 193 [137 P.2d 437]; and *People* v. *Allen*, (1943) 22 Cal.2d 191 [137 P.2d 439].)

 The evidence was sufficient to support the judgment. The judgment and the order denying the motion for a new trial are affirmed.

Shinn, Acting P. J., and Shaw, J. pro tem., concurred.