[Crim. No. 3804.   Second Dist., Div. One.   Nov. 6, 1944.]

THE PEOPLE, Respondent, v. MARJORIE P. BARNHART, Appellant.

Franklin B. MacCarthy for Appellant.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, Fred N. Howser, District Attorney, and Robert Wheeler, Deputy District Attorney, for Respondent.

YORK, P. J.—Following a trial upon an information containing two counts charging that plaintiff on July 28, 1943,

(1) kept and occupied a house at 1809 North Marengo Avenue, Pasadena, with paraphernalia used for the purpose of registering bets on horse races; and (2) recorded and registered bets on horse racing, in violation of subdivisions 2 and 4, respectively, of section 337a of the Penal Code, plaintiff was found guilty as charged and sentenced to the county jail for a term of thirty days as to each count, sentences to run concurrently.

This appeal is prosecuted from the judgment of conviction, it being contended that the evidence is insufficient to sustain the judgment, and that the trial court committed errors of law in the admission of evidence.

By stipulation, the cause was submitted to the trial court upon the transcript of the preliminary examination, which discloses that on July 28, 1943, around 12:10 p.m., Paul De Falla, a Deputy Sheriff of Los Angeles County, accompanied by another deputy sheriff, went to the premises in question, and, according to De Falla's testimony, he knocked at the back door and told appellant, who answered the summons, that he had come "to check some suspected gas leaks." Said premises consisted of a five-room house where appellant and her husband resided, and a small house in the rear occupied by appellant's grandmother. Appellant was alone in the house, and as the officers walked through the front room and down a hall to a smaller room containing some bookmaking paraphernalia and two telephones, appellant preceded the officers at which time "One of the telephones was on its cradle and the other telephone was off its cradle. She (appellant) took one off while I was there. I saw her do it." At the instant trial, it was stipulated that "there were two phones in the rear house and one was connected with the telephone in her (appellant's) house."

In addition to the telephones (Exhibit A), a yellow sheet (Exhibit B) referred to as a betting marker; a Metropolitan scratch sheet (Exhibit C); two telephone bills (Exhibit D); and an exemplar of appellant's handwriting (Exhibit F), were introduced in evidence.

Officer De Falla immediately placed appellant under arrest at which time the following conversation took place between him and appellant, in the presence of Deputy Sheriff Kapic, Officers Hand and Hughes of the Pasadena Police Department, and Mrs. Sherman, a clerk in said department.

"I asked Mrs. Barnhart how long she had been book-making

there at that address and she said she wasn't booking at all. I asked her who she was working for or if she was working for herself. She replied that she wasn't working. I then asked her if she lived there and she said she did. I asked her for how long she had been living there and she said she had lived there for three years. I asked her if she was the owner of the house and she said she was the owner of it. I asked her in whose name were the telephones there, and who paid the bills, and she gave me the name of Ethel Barnes and Stanley C. Barnhart. I asked her if Stanley C. Barnhart was her husband, and she said he was. I asked her where he was, and he was out of town, according to her. I asked her who was the elderly lady in the little house in the rear of the lot, which was numbered 1811 North Marengo Avenue, and she said the elderly lady was her grandmother. I then asked her how she got the race results, whether over the radio, and she said, 'How could I when the radio isn't turned on?' I asked her if she got service over the telephone and she said 'I don't know what you are talking about.' I asked her if she had written these records there, and she replied that she would rather not talk until she had an opportunity to see somebody about it. Then I accused her of being a book-maker and she denied it.''

This witness qualified as an expert on bookmaking and testified that the betting marker, Exhibit B, ''is ruled off in pencil and under various names there are listed columns of figures;'' that these represented ''bets made by the people under whose names they appear. The names on the sheet are Dad, Bob, A.B., Charlie, R.E.C., Knight—turn the page over— there is the name MacGore, which is an abbreviation for something. Then Rex, Teddy, Don, Edna, Bailey and Barnes. Under these names some numbers appear.'' Then referring to the scratch sheets, Exhibit C, bearing the date of July 28, 1943, the witness testified that the scratch sheet ''has the entries, or purported entries, running at race tracks through the United States, such as Saratoga, New York, Suffolk Downs in Massachusetts, and Arlington Park, in Illinois. Under each of these race tracks there are several races listed, running from 1 to 8 or 9. Now, in each of these races there has been a number placed and it is those numbers of each race that compare to the numbers under the various names I just stated.'' As the result of a check of the scratch sheet with the numbers and marks appearing upon Exhibits B and C, the witness testified: ''Under the name 'Teddy' there appears the figures

302 dash 10 dash 5 dash zero. The 302 refers to the horse purported to be running in the second race at Saratoga, New York, said horse being named 'Royal Nap'. That is what the 302 means. . . . And the figures '10' after it, in my opinion means $10.00 to win; and the figure '5' after that means $5.00 to place; and the figure '0' after that means nothing to show. . . . The next column down and still under the name Teddy there appears to be the following figures, 650 dash 10 dash 5 dash zero. The number 650, in my opinion— . . . The 650, in my opinion, referring to the horse named 'Liberanti', purported to be running in the third race at Arlington Park, Illinois. The 10 after that means a $10.00 wager to win; the 5 after that means $5.00 to show—no, $5.00 to place, and the zero means nothing to show.'' Taking the name Edna, the witness testified ''There are the figures 281 dash 10. The 281, in my opinion, refers to a horse by the name of 'Hasteville' purported to be running in the fifth race at Saratoga, New York. The figure 10 after that means a $10.00 wager was made for the horse to win.'' He then testified that his opinion was based upon the customs and usages incident to the bookmaking fraternity in Los Angeles County; and that he made an individual check of all of the enumerated numbers under these respective names with the scratch sheet, Exhibit C.

When Officers Hand and Hughes arrived at the scene the telephone receivers were replaced on the hooks and Mrs. Sherman, a clerk in the Pasadena Police Department, answered the telephones as they rang, to wit: ''There was one 'phone on a chair and the other one was on the desk. And so I answered the one on the chair, and I said 'Go ahead', and a man's voice . . . answered and said 'Who is this?' and I said 'Jane', not knowing the first name of Mrs. Barnhart. And he said, 'How are you?' and I said, 'I am fine'; and then he said, 'Do you know who this is?' and I said 'No'. I then said, 'Go ahead if you want to place any bets'. . . . And he said, 'What are you talking about?' and I said, 'Go ahead'. Then he said, 'I just wanted to ask you for a date tonight', and I said 'What are you talking about'; I said 'you know I won't go out with you'. And he said, 'Well, never mind then', and hung up. In the meantime the other telephone was ringing and I answered that, and as soon as I answered that Officer De Falla asked Mrs. Barnhart her name and I overhead the conversation and she told him her name was Marjorie. So I answered the phone and I said 'Hello', and the voice on the

other end of the line said 'Hello' and I said 'Hello', and he said 'Who is this?' and I said, 'This is Marjorie,' and he said, 'No, it isn't'. He said, 'I know her voice'. Then I said, 'No, this isn't Marjorie, she is busy; can I help you?' He said, 'Yes, in the 5th race at Saratoga', and I said 'which horse?' and he said 'the same', and I said 'how much?' and he said 5, 5 and 8. . . . Then the next time the 'phone rang I said 'Hello', and a voice said 'This is Charlie', and it then said, 'Hi, Marj.,' and he said, 'Give me one across on Diggie in the first race at New York.' I said 'Any others?' and he said, 'One across on Number 17, the second at Washington.' Then the 'phone on the chair rang and I said 'Hello', and a voice said, 'Is this Marj.?' and I said, 'Yes', I said, 'This is Marj.' and a woman's voice said, 'What's the matter?' and I said 'Nothing', and then I said, 'Who is this?' and she said, 'This is Erma, don't you recognize my voice?' and I said, 'O, Hello, Erma, how are you?' and she said 'Fine'. In the meantime the telephone on the desk rang and I said, 'Will you hold the 'phone as I want to take another call', and I answered that by saying 'Hello', and a voice said, . . . 'This is Ann and I want to place a bet for Katherine'. I said, 'Which race?' and she said, 'In the third at Arlington', and she wanted two across on Bellmand and two across on Trust Buster and four across on Bitter End. Then she hung up and I returned to the telephone where Erma had been holding on and I said 'Okey', and she said 'I thought you were in trouble as it sure didn't sound like you at first', and so I coughed and said, 'I have a very bad cold'. I said, 'I am kind of rushed if you want to give me any wagers you better hurry with them', and she said 'Okey, give me the fifth at New York, number 1, two across, and number 10, one across.' Then the last bet I got, or the last party I talked to was a man named Dave, and that was also when I hung up after talking to Erma on the same 'phone. He said, 'This is Dave,' and he started right out and said 'Give me the third at Suffolk, number 1, two across the board.' He then said, 'At Arlington Park, Margin in the 5th, two across, and Roiter in the sixth, two across, and Fortress in the second, two across,' and then he said, 'Suffolk in the eighth, two across'.''

The witness Hughes testified as to People's Exhibit F for Identification, that it was an exemplar of the handwriting of appellant and that she wrote it in his presence.

An handwriting expert, Officer Don E. Mier of the Los

Angeles Police Department testified that in his opinion "the pencil writing on the face of the paper marked People's Exhibit F, and the pencil writing on the reverse side of People's. Exhibit F, was made by the same person that made the pencil writing, that is, most of the pencil writing on People's Exhibit B (the betting marker). . . . In my opinion, the pencil writing on People's Exhibit F, the front and reverse sides of it, and most of the pencil writing on People's Exhibit C (the scratch sheet) was made by the same person. Q. Is there some writing by someone else on that People's Exhibit C for Identification? A. Yes, there is; I have some writing of my own on there. Q. Well, then, how much of the writing on that exhibit—— A. (interrupting) I would say practically all of the figures on the inside relating to the race at Saratoga. Q. You refer to the figures on the left-hand margin. A. That is correct; and also here, the second column where it says 'Odds', in my opinion, all that writing in each one of the races was made by the same person that wrote People's Exhibit F. for Identification." On cross-examination, said witness in answer to the question: "Now, referring to that marker (Exhibit B) you said that most of the handwriting thereon was put there by the person that wrote the exemplar . . . You say that most of it is in the same handwriting? A. That is correct. Down in the lower righthand corner there are some initials, and it looks like W.T. and W.K., and there is also some pen and ink writing, and also I have some writing, my initials 'D.M.' and the number 81743, meaning 8/17/43, that I put on there. All the rest of the writing with the exception of that, in my opinion, was made by the same person that wrote People's Exhibit F for Identification. Q. Is it your opinion then that there are three or more different handwritings on the marker; is that correct? A. I wouldn't say how many, but there are different writings on there. Q. There are more than the defendant's and yourself; is that correct? A. Yes, I would say so."

Appellant urges that "the Metropolitan scratch sheet and the betting marker, while they contained some writings of defendant, did not establish that defendant registered a bet. Neither did the presence of these documents at the home of defendant and her husband constitute a violation of subdivision 2 of section 337a of the Penal Code."

While it is true that mere presence of these documents in the house, standing alone, might not constitute a

violation of said subdivision 2, their presence under the circumstances above recited, both of them bearing appellant's handwriting, the betting marker containing thirteen entries of bets on horse races being run at various tracks throughout the United States on the day in question, and the fact that appellant, in order to prevent the telephones from ringing while the officers were in the house, removed the receivers from the hooks,—considered altogether, present a situation that is inconsistent with innocence and consistent with the hypothesis of guilt, not only of a violation of subdivision 2 of section 337a of the Penal Code, but of subdivision 4, thereof, as well.

■ It is now well settled that a violation of subdivision 2, *supra,* is complete when it is shown that the accused *occupied* a place with papers and paraphernalia for the purpose of registering bets. The offense denounced by that subdivision is the *occupancy* of the place with the necessary equipment for recording bets, not the actual making of bets. (*People* v. *Kabakoff,* 45 Cal.App.2d 170, 173 [113 P.2d 760] ; *People* v. *Manning,* 37 Cal.App.2d 41, 43 [98 P.2d 748] ; *People* v. *D'Angelo,* 60 Cal.App.2d 73, 78 [140 P.2d 113] ; *People* v. *Hinkle,* 64 Cal.App. 375, 380 [221 P. 693].) ■ Moreover, the purpose for which the place or room was being used and occupied need not be established by direct evidence, but may be gathered from all the surrounding circumstances shown by the evidence. (*People* v. *D'Angelo,* 60 Cal.App.2d 73, 78 [140 P.2d 113], citing *People* v. *Tuttle,* 27 Cal.App.2d 647, 649 [81 P.2d 571] ; *People* v. *Tepper,* 36 Cal.App.2d 525, 527 [97 P.2d 1002].) If the circumstances shown in evidence reasonably justify the finding of guilt by the trial court, a reviewing court is not warranted in disturbing the finding. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778] ; *People* v. *Allen,* 22 Cal.2d 191 [137 P.2d 439] ; *People* v. *Vertlieb,* 22 Cal.2d 193 [137 P.2d 437].) See, also, *People* v. *D'Angelo, supra,* at page 79.)

Under the authority of *People* v. *Joffe,* 45 Cal.App.2d 233, 235 [113 P.2d 901], and *People* v. *Reifenstuhl,* 37 Cal.App.2d 402, 405 [99 P.2d 564] evidence of telephonic conversations between arresting officers and persons calling the establishment are properly admitted as tending to establish the fact that the premises were *occupied* for the purpose of bookmaking.

Applying the foregoing principles of law to the facts disclosed by the record herein, the evidence is sufficient to sustain

the conviction of a violation of subdivision 2, section 337a, *supra*.

Subdivision 4 of the statute provides: That every person "Who, whether for gain, hire, reward, or gratuitously, or otherwise, at any time or place, records, or registers any bet or bets, wager or wagers, upon the result, or purported result," of a horse race, "is punishable etc."

It was held in the recent case of *People* v. *Newman*, 24 Cal. 2d 168, 173, 174 [148 P.2d 4], that the evidence therein presented sustained a finding that defendant had registered an actual bet, contrary to the provisions of said subdivision 4 of section 337a of the Penal Code, where scratch sheets, on which names of numerous horses were checked off or erased, were under his coat in the room in which he was arrested; where papers on which were figures and words, known as betting markers, were found in a nearby room; and where a memorandum book which he deposited at the police station after his arrest contained many similar entries of names, dates and amounts." It was further stated in the cited case: "All the paraphernalia used by bookmakers was found in the possession of the appellant at the time of his arrest, and no explanation is to be found in the record as to any reason why he had these articles or was using them in the manner shown by the evidence. Then his attempt to conceal from the arresting officers the National Scratch Sheet under his coat, and the group of papers found in Room 18, tend to show that he was not using them for a legal purpose."

In the instant case, there was present and in the possession of appellant all the paraphernalia used by bookmakers; likewise appellant did not explain innocently or at all its possession. Moreover, guilty action was present in that appellant tried to stop incoming telephone calls by taking and leaving the telephone receivers off the hooks, and as soon as the telephones were restored to operation bets were received by the witness Sherman, as hereinbefore narrated. Suffice to say, there is sufficient evidence in the record to sustain the judgment of conviction of a violation of subdivision 4, section 337a, *supra*.

At the time of the trial, appellant urged that the narrative of a series of telephone conversations given by a police employee, Mrs. Elizabeth Sherman, which are quoted verbatim in this opinion, violated the Federal Communications Act of 1934 (48 Stats. 1064, 1103; 47 U.S.C.A. 605), and the cause

was submitted to await the outcome of *People* v. *Kelley,* 22 Cal.2d 169 [137 P.2d 1], which was then pending before the United States Supreme Court on a "Petition for Appeal" which has since been denied.

Appellant here contends that her conviction based upon "the divulgence of intercepted telephone conversations" in violation of said Federal Communications Act "constitutes the deprivation of defendant's liberty without due process of law, in violation of the 14th Amendment to the Constitution of the United States."

In the Kelley case, *supra,* it was held by our Supreme Court that, assuming that the Federal Communications Act of 1934 which declares that no person not authorized by the sender shall intercept or divulge the contents of a communication, applies to evidence offered in a state court, such statute does not render inadmissible the testimony of police officers as to telephone calls received by them in an apartment which accused occupied with equipment for the purpose of recording bets, as the accused was not a party to the intercepted communications and hence was not a sender entitled to the protection of the statute.

For the reasons stated, the judgment is affirmed.

DORAN, J.—I concur in the judgment.— ▮ But I know of no rule or principle of law that authorizes or justifies a relaxation of the hearsay rule for expediency. The evidence of the telephone conversations was pure hearsay. Evidence of the fact that a conversation was received would be admissible for the purpose of proving that the telephone was in order and functioning, but for no other purpose; the substance of the conversation is unnecessary for this purpose. The argument in *People* v. *Joffe,* 45 Cal.App.2d 233, 235 [113 P.2d 901], namely, that such evidence is admissible because "it tended to establish the fact that the premises were occupied for the purpose of recording wagers on horse races," clearly permits a consideration of hearsay for the purpose of proving the very offense charged. And the same inaccurate reasoning appears in *People* v. *Reifenstuhl,* 37 Cal.App.2d 402, 405 [99 P.2d 564], where the court declared, referring to such evidence, that "It was not subject to the hearsay rule. The conversation was not admitted for the purpose of proving its own contents (16 Cor.Jur. 624) but to prove the use to which the telephone was subjected by the public and to demonstrate the

reaction of the defendant at the time. The use of the room occupied by defendant was in issue and the nature of the telephonic call was a circumstance to establish the truth. The uses to which a telephone is put reveal more truthfully the character of the establishment that houses the instrument than do the words of description attached to the listing.''

It is futile to argue that such evidence is not hearsay. In my judgment the preservation of the hearsay rule is not only important but vital in the administration of justice. To relax the rule just to uphold the conviction of a bookmaker, or for any other purpose, is nothing short of judicial stupidity.

White, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 4, 1944. Carter, J., and Schauer, J., voted for a hearing.