[Crim. No. 748. Fourth Dist. Mar. 28, 1951.]

THE PEOPLE, Respondent, v. LAURENCE K. GOMPERTZ et al., Appellants.

Edgar B. Hervey and Henry F. Walker for Appellants.

Edmund G. Brown, Attorney General, Donald D. Stoker, Deputy Attorney General, James Don Keller, District Attorney, and John Robert Sorbo, Deputy District Attorney, for Respondent.

GRIFFIN, J.—Defendants Laurence K. Gompertz and Leonard Brophy were convicted of the crime denounced by section 337a, subdivision 2, Penal Code. No judgment was pronounced nor sentence imposed. They were granted conditional probation and now appeal from the order denying a new trial. Defendants' main contention is that the evidence produced was insufficient to establish that they occupied the place with books, papers, or paraphernalia *for the purpose of recording or registering bets* upon the results of horse races.

The arresting officers testified generally that they went to a store building located at 2975 National Avenue; that one small room therein was occupied by these defendants; that an adjoining storeroom was occupied by the "Circus Cafe." Defendants did not testify at the trial. The evidence shows that they occupied the room at the time, but they urge that it was used merely for the purpose of engaging in the making and distribution of mimeographed "run-down" or "scratch" sheets, a legal business enterprise.

Brophy first rented the room in July, 1949. A mailbox was placed at the office door (the only entrance to the room) giving the address as 2977 and the name "J. Saunders Products," "Donovan Elec. Supply." In August, 1949, application was made under the name "James Donovan" for a phone. It was listed as "Donovan Electrical Appliance" at 2977 National Avenue. There were no signs on or at the store building indicating that defendants were engaged in the elec-

trical business. The only window in the room was obscured by a covering.

An investigator testified that he made diligent inquiry in regard to the "Donovan Electrical Supply Co." but was unable to find any record or information as to its actual existence or operation. No search was made as to the "J. Saunders Products Co." When the officers raided the place on July 21, 1950, about 8:20 a.m. defendants Brophy and Gompertz were standing directly opposite the mimeograph machine and were operating it. Three other persons were in the room, including one *Gene* Baehr. Two tables were found. One held the mimeograph machine. One desk carried a radio set capable of receiving short wave broadcasts. There was an electric clock, and a connected telephone on the desk which bore the number FR 9-3968. A printed and published "Daily Racing Form" for July 21, showing the several entries for races to be run on that day, past performance of the horses, names of owners, trainers, jockeys, and other such information was found near the table. On the table were stacks of papers. Some were mimeographed and were described as "run-down sheets" or "scratch sheets." Found in a near-by cardboard box (also described as a "trash box" or "paper basket") were similar "sheets" showing the index number and names of the horses at the several tracks, the jockeys, their weight, probable odds, and other such information. Found with them, folded in a rubber band, were numerous smaller sheets, described by the officer as "registration of bets on horse races made for the previous day," on which were written the names of individuals and certain numbers. As a sample, one of them contained the name "Chet Keller—954—968," followed by the figure (1) in the first column, nothing in the second column, and the figure (1) appearing again in the third column. Opposite it was the figure 1595. Opposite the figure 969 appeared the figure (1) in all three columns, followed by the figure 920. Opposite the figure 155-17 appeared the figure (1) in the first and third columns, followed by the figure, 385, totaling 2900. Then follows what appears to be a summarization: "P-2900 T-700." Underneath a subtraction line appears the figure "-2200." The officer explained that the first numbers indicated the index number of the horses, that the bettor bet the amount indicated in the first column to win, next to place, and the next to show, and the other figures indicated whether the bettor won or lost and the amount.

Chet Keller was called as a witness for the People. He

stated he knew a man named Baehr; that he had indirectly placed bets with him by telephone; that Baehr had given him certain telephone numbers to call if he desired to place a bet; that he just called one of the numbers and made a bet and if the phone was busy he would call another; that he did not at that time remember the telephone numbers given him by Baehr because he destroyed the sheet on which he kept those numbers after identifying the number which the investigator had with him when they called on him about making bets at this address on National Avenue; that he never made bets with Baehr personally but it was true some unidentified person was reached by calling a number given by Baehr; that sometimes he won and others he lost; that Baehr or some person other than defendants would call at Keller's place of business and pay him or collect, as the case might be; that the parties who called would have a columnar sheet which looked similar in form to the small sheets attached to People's Exhibit 17, which the officer testified were a recordation of bets.

The men who were taken to the police station were searched. Defendants had small sums of money on their persons. Baehr had $1,938 in currency. There was also removed from his pocket small columnar sheets and adding machine tape contained in an envelope marked "*Gene* and Jimmie," and appeared to be an accounting of Baehr's business in respect to certain named persons and as to whether they had won or lost. Many of these names also appeared on People's Exhibit 17, found by the officers on National Avenue. One of the arrested persons, other than defendants, had some columnar or collection sheets on his person, similar to those mentioned. He tried to hide them by putting them in his shoes and also by hiding them behind the jail door. Another had "Pay-out sheets" which he threw beside the store building while in custody of the officer. He had several hundred dollars on him when he was searched.

Sergeant Whitney, in charge of the vice squad, who qualified as an expert investigator on the subject of bookmaking, testified that accurate time clocks are used by bookmakers in determining the post time of a race; that some bookmakers use a short-wave radio set in obtaining racing information; that the other exhibits found in the room, excepting the mimeograph machine, were a type of paraphernalia ordinarily used by bookmakers and that some of the exhibits were "bet registrations or other notations commonly made by bookmakers."

Statements were taken of all parties arrested that morning. Brophy stated generally that he rented the room in question the year before; that the equipment was his; that the telephone was not in his name; that he had one employee (defendant Gompertz); that his occupation was that of operating a news service and that he distributed mimeograph sheets to his customers.

Defendant Gompertz stated that he was employed by Brophy; that he obtained the information from the "green sheets" and typed the stencils from it; that some man whom he did not know, phoned the price to be put on it; that the radio was used on the ordinary band to receive results on the races which were broadcast from one of the regular stations in Los Angeles; that he wrote these results down and that occasionally, whenever persons called in to ascertain the results of a race, he furnished that information; that the names, numbers, etc. appearing on Exhibit 17 were "something made up by somebody outside of me. It is not in my right"; that the men arrested at the place of business with him were unknown to him. The officers testified they were all bookmakers.

Defendants offered in evidence the statement of Baehr, in which he stated that he was a "cleaning operator"; that he just happened to be at that address that morning as a visitor; that he worked for himself and that he did not know what the envelope on him marked "Gene and Jimmie" was and did not recall who gave it to him; that he did not know what the names, initials and markings on the slip meant but that they concerned his collections for his cleaning business; that some of the markings were in his handwriting. He then stated that he had been arrested in 1950 for suspicion of bookmaking.

As heretofore stated, it is defendants' claim that the papers which indicated a registration of bets found in the cardboard box must have belonged to Baehr, if anyone; that he must have thrown them there because the defendants in this action were too far from the box at the time of the raid and that no one saw them throw them there. This, no doubt, was the argument made to the jury, which argument was rejected by it.

It is true, as stated in *People* v. *Simon*, 66 Cal.App.2d 860 [153 P.2d 420], that in a prosecution under this section and subdivision, some causal connection must be shown between the paraphernalia found on the premises and the defendant before a conviction can be sustained. Such causal connection must be established as would reasonably justify

an inference that the defendant occupied and kept a place where such devices were utilized for the purpose of recording or registering bets. (*People* v. *O'Brien,* 37 Cal.App.2d 708, 712 [100 P.2d 367]; *People* v. *Fisk,* 32 Cal.App.2d 26 [89 P.2d 142]; *People* v. *Rabalete,* 28 Cal.App.2d 480 [82 P.2d 707].) ■ However, the prosecution is not required to show that a race was actually run or that any bet was actually made. (*People* v. *Warnick,* 86 Cal.App.2d 900 [195 P.2d 552].)

■ The purpose for which the place or room was being used or occupied need not be established by direct evidence, but may be gathered from all the surrounding circumstances shown by the evidence. (*People* v. *Newland,* 15 Cal.2d 678, 683 [104 P.2d 778]; *People* v. *Barnhart,* 66 Cal.App.2d 714, 721 [153 P.2d 214].) There is no contention that defendants were not in possession of the premises.

■ It is clearly shown that the business of "electrical appliances" was not being conducted at this establishment and defendants made no indication to the public that they were in that purported legal enterprise. They made efforts to conceal their activities, as indicated by the telephone registration, the mailbox, the house number, and the obscurity of the window. All of these circumstances were unexplained by defendants. The jury was entitled to conclude that the occupancy of the room was for illegal purposes. (*People* v. *Walker,* 99 Cal.App.2d 238, 242 [221 P.2d 287].) ■ Most of the equipment in the room was shown to be types of paraphernalia used by bookmakers. The officers did testify to the effect that each of the items could have a *legal* use and that the possession of *any one* of the items would not necessarily give rise to an inference that the person was a bookmaker. It is defendants' contention that the evidence in this respect was "without contradiction" and that none of the items found in the room bore or gave any indication of having been used or designed for the purpose of recording or registering any bets except the possible exception of People's Exhibit 17. In view of all the evidence the jury was entitled to infer that the paraphernalia was used to facilitate the recordation of bets, and not merely for use in the mimeographing of "run-down" sheets. The evidence shows that at least one known bookmaker and a number of other persons possessing bet recordations were on the premises at the time. The finding of People's Exhibit 17 on those premises, which was unexplained by either defendant, together with the testimony of the witness Keller, might well have supported the jury's

conclusion that the defendants occupied the place and kept the paraphernalia found there for the purpose of recording bets. It was explained to the jury that a bookmaker often has a clerk or clerks in a room with a telephone and they record bets from the bookmaker's agents who take bets while walking around the streets or in bars.

The statement of defendant Gompertz indicates that after running the stencils on the mimeograph machine he would then stay at the office the rest of the day ''in case the phone should ring.'' It is true that the testimony of the officers on cross-examination did tend to show that defendants might not have had an opportunity to throw the papers into the basket while the officers were approaching or while they were in the room and that Baehr might have had such an opportunity. It is to be noted that neither of the defendants took the witness stand to deny knowledge of the pack of papers found in the file basket or to explain what the file baskets were used for, or to otherwise explain how the papers happened to be found where they were. The jury might have inferred that the other bettors, whose names were in common on two sets of papers, also placed bets with persons other than Baehr, or that defendants were Baehr's agents in receiving and recording bets for him. The inference, from all the facts established, is that defendants, operating as they were with a false front, were linked with Baehr in his bookmaking activities and that the papers were, at the time of discovery, prepared for delivery to Baehr. (*People* v. *Rumley,* 100 Cal.App.2d 6, 9 [222 P.2d 913]; *People* v. *Kulwin,* 102 Cal.App.2d 104 [226 P.2d 672]; *People* v. *Gory,* 28 Cal.2d 450 [170 P.2d 433].)

■ On appeal by defendant from a judgment of conviction the evidence is to be viewed in the light most favorable to the prosecution. (*People* v. *Cayer,* 102 Cal.App.2d 643 [228 P.2d 70].) ■ We conclude that the circumstances shown by the evidence reasonably justify the finding of guilt by the jury and, accordingly, a reviewing court is not warranted in disturbing the finding. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Barnhart, supra.*)

■ The trial judge, in a dialogue between himself and defendants' counsel, unnecessarily made the statement that the human mind was a paraphernalia within the meaning of the Penal Code section here involved. Defendants assigned such statement as prejudicial error. An expert witness testified that bookmakers usually used some means of recording bets which are readily disposable, such as match boxes or

slips of paper, and that sometimes they are written on the cuff of a shirt. The question was then propounded of the witness: ". . . isn't it also a fact that many bookmakers use no records of bets at all? Relying simply upon their memory?" Objection was made to the question and the court remarked: "You can register it in your mind. MR. HERVEY: I don't think you can record it and register it in your mind. Especially I don't think the human brain can very well be called paraphernalia. THE COURT: I think it would be. Overruled. MR. HERVEY: You think the brain would be paraphernalia? THE COURT: Best paraphernalia I know." After assigning the court's statement as prejudicial misconduct, the court said: "Well, the reason I made the remark was some people have very, very brilliant minds and they are very, very active. MR. HERVEY: . . . if Your Honor please, . . . the jury might get from Your Honor's remark the idea that when a person is charged with occupying a room with the device and books and papers for the purpose of recording bets that the law contemplates the paraphernalia to be their human brain, which I submit is not true. THE COURT: That wasn't the purpose of my remark. MR. HERVEY: I am sure it isn't." Then followed some further colloquy and thereafter the witness was permitted to answer the question whether or not in his opinion "would it be possible, then, for a bookmaker to occupy a room with no more equipment than a telephone? . . . Relying . . . on memory as a means of recording bets?" The answer was: "It is possible, but not very probable."

There was no evidence or contention that defendants so operated. The court's remarks might well have been left unsaid. However, they were clarified by the dialogue that followed. This clarification was accepted by counsel. The answer to the question could not be said to be prejudicial to defendants' rights. No prejudicial error resulted.

Next it is contended that, although defendants offered no instructions, the court erred in not instructing the jury on its own motion to the effect that since there was no causal connection established between either defendant and Exhibit 17, no crime was committed by them, and that such causal connection forms an essential part of the crime here charged, citing *People* v. *Putnam,* 20 Cal.2d 885, 890 [129 P.2d 367]; and *People* v. *Sanchez,* 35 Cal.2d 522, 528 [219 P.2d 9]. Section 337a, subdivision 2, of the Penal Code was read to the

jury, and other pertinent instructions bearing on the proof required were given. Since the defendants offered no specific instruction on that subject and since the question was adequately covered by other general instructions given, no prejudicial error resulted. (*People* v. *Klor,* 32 Cal.2d 658, 662 [197 P.2d 705] ; *People* v. *Carothers,* 77 Cal.App.2d 252, 255 [175 P.2d 30] ; *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8].)

It is also argued that in some of the instructions the court used the term ''occupied the premises for the purpose of *taking* bets'' when the statute requires that it be for the purpose of ''registering or recording'' bets. It is true that the charge made and denounced by the section under discussion is ''registering or recording'' and not the ''taking'' of bets. The first instruction was given in the language of the statute. Other instructions contained a proper charge to the jury. A single instruction or a portion of other given instructions cannot be singled out and considered separately from the entire charge. (*People* v. *Frazier,* 88 Cal.App.2d 99, 105 [198 P.2d 325] ; *People* v. *Newland,* 15 Cal.2d 678, 684 [104 P.2d 778].) It might be fairly said that more evidence would be required to prove that the room was used for the purpose of *taking* bets than for the purpose of *registering* or *recording* bets. It is difficult to see how the defendants were in any way prejudiced by the claimed error. When the instructions are considered as a whole they were not misleading nor did they result in a miscarriage of justice. (Const., art. VI, § 4½; *People* v. *Warren,* 16 Cal.2d 103, 114 [104 P.2d 1024].)

Lastly, defendants charge that the court erred in not granting them a new trial upon the showing made. They presented affidavits indicating that prior to trial they endeavored to subpoena Baehr as a witness; that what he would testify to was unknown to them; that they were unable to locate him; that after the trial he was located and that he did, on October 26, 1950, make an affidavit and present it to defendants' counsel, which affidavit was to the effect that he had deposited Exhibit 17 in the basket that morning without defendants' knowledge and that he could not ''in good conscience stand by and see defendants convicted on false evidence.'' The court denied the motion stating that it felt that (1) due diligence had not been shown; and (2) that upon a new trial Mr. Baehr, if called as a witness, could refuse to testify to the facts set forth in his affidavit on the ground that his answers might tend to incriminate him and

that therefore the evidence would not in such event be permitted to be introduced on any new trial. Defendants claim error in this ruling and cite such cases as *People* v. *Goodwin,* 202 Cal. 527 [261 P. 1009]; and *People* v. *Lewis,* 64 Cal. 401 [1 P. 490].

Usually, the question of due diligence and the propriety of granting a new trial on the grounds of newly discovered evidence are factual questions for the trial court.

Unless a clear abuse of discretion is shown, an appellate tribunal will not interfere. (*People* v. *Addington,* 43 Cal. App.2d 591 [111 P.2d 356]; *People* v. *Goodale,* 33 Cal.App. 2d 80 [91 P.2d 163].) Due diligence in searching for a witness is discussed in *People* v. *Kuranoff,* 100 Cal.App.2d 673, 677 [224 P.2d 402].

In the absence of the witness Baehr, the affidavit could not be used on a new trial. The trial court was within its right in taking the position that Baehr might not be available at a new trial and that if available he might choose to stand on his constitutional rights and refuse to testify. He did not aver in his affidavit that he would be willing to testify to the facts contained in his affidavit at a new trial, nor that he would be present and available as a witness. He did not admit that Exhibit 17 was a recordation of bets on horse races. He may have still contended at a new trial that they involved transactions connected with his "cleaning business." It is not uncommon, after trial, for one not charged with a crime to attempt to absolve his fellow confederate who has been convicted. (*People* v. *Morton,* 32 Cal. App.2d 662 [90 P.2d 845].) The trial court was not bound to accept the statement of Baehr as true. (*People* v. *Kirk,* 98 Cal.App.2d 687 [220 P.2d 976].) It was entitled to regard it with distrust and disfavor. (*People* v. *Fong Shee Shung,* 42 Cal.App.2d 721 [109 P.2d 974]; *People* v. *Weber,* 149 Cal. 325, 350 [86 P. 671]; *People* v. *English,* 68 Cal.App. 2d 670, 673 [157 P.2d 429].)

Before denying the motion herein, the trial court heard the comprehensive argument of attorney for appellants on the law and the evidence but refused to set aside the jury's verdict. It was fully argued by him to the jury that the recordations of bets found in the basket were not placed there by the defendants but were placed there by Baehr. At the trial defendants relied upon Baehr's statement made to the police after his arrest, which defendants placed in evidence. Notwithstanding this evidence and the argument made by

counsel, the court rejected the theory that Baehr alone was responsible. It does not appear that the court, in denying the motion for new trial, abused the discretion which is given to it.

Order denying new trial affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition·for a rehearing was denied April 6, 1951, and appellants' petition for a hearing by the Supreme Court was denied April 26, 1951. Carter, J., voted for a hearing.