[Crim. No. 5476. Second Dist., Div. Three. Feb. 9, 1956.]

THE PEOPLE, Respondent, v. SAM GOLDSTEIN,
Appellant.

Andrew R. Edwards for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

VALLÉE, J.—Defendant was charged by information in Count I with, on February 16, 1955, unlawfully keeping and occupying a newsstand in Pasadena with papers for the purpose of recording and registering a bet or bets on horse races (Pen. Code, § 337a, subd. 2), and in Count II with, on February 16, 1955, unlawfully having recorded and registered a bet or bets on horse races (Pen. Code, § 337a, subd. 4). In a jury trial he was convicted as charged in both counts. He appeals from the judgment and the order denying his motion for a new trial.

In February, 1955, defendant operated a magazine newsstand in Pasadena. The newsstand consisted of two rooms—a front room about 15 feet wide and 22 feet deep and a rear room directly back of that about 15 feet wide by 8 feet deep. The front room contained a candy-cigar counter and the usual racks for magazines and newspapers. The rear room contained storage shelves, a small table, boxes of magazines and newspapers, and one window covered by a torn, green blind.

On February 16, 1955, police officers Marshall and Gardner, stationed across the street, watched defendant's premises from 11:45 a. m. to 2 p. m. with glasses. During that time they saw 8 to 10 persons separately enter the front room of the building and proceed immediately to the rear room. A few seconds after a person went into the rear room, defendant followed him into the room. Ten or 15 seconds later defendant returned to the front room, each time putting his pen into his shirt pocket. The other person then came out of the rear room and left the premises. The officers could not recall that any of the persons who went into the rear room made a purchase in the front room. They did not observe any of the individuals hand any money to defendant, take anything from him, or conduct any activity connected with what may have transpired in the rear room. The officers did not identify any one of the 8 or 10 persons; they did not stop or converse with any one of them. They did not know whether the persons who entered the building were sales people or personal friends of defendant or what connection they may have had with him.

Shortly after 2 p. m. the officers went into the newsstand. One said to defendant, "Hi, Sam, do you mind if I look around?" Defendant said, "Go ahead. You won't find anything here." The two officers proceeded into the rear room. Officer Marshall testified he found a group of six papers on the framing of a partition in the rear room with a series of letters written on them; he asked defendant what they were; defendant said it was a form of double bookkeeping for the purpose of evading taxes; he asked defendant to explain; defendant said, "I can't; you will have to talk to my lawyer."

Officer Marshall, who qualified as an expert on bookmaking, further testified he decoded the six papers and in his opinion they were betting markers; "I also checked as a result of breaking that down, I checked the numerals, say the fifth race, the tenth horse, I checked that against the racing sheet, the entries for Santa Anita for that particular date, and found in fact that there was a tenth horse entered in the fifth race, and so on down through the sheets." The witness purchased a "Daily Racing Form" of February 16, 1955, showing the horses entered at Santa Anita on that day and compared the figures on the six slips with the entries in the racing form. He further testified about the papers: "In the 6th race, Dawn Lark was the horse in the 4th post position at Santa Anita on February 16"; in my "opinion . . . that top entry, 6, 4, 20, indicates that was a $20 bet on Dawn Lark in the 6th race at Santa Anita" on that date; I would classify the slips of paper "as betting markers, as part of a bookmaker's paraphernalia"; I found "that all the betting markers were subject to the same interpretation as was put on the board there, from Exhibit No. 4"; "I ran into a little bit of a puzzle when I found I had the 20th post position, which is an unusually large number of horses to be running; but in checking the Santa Anita entries I did find that in the 7th race they had as many as 23 horses running. The only other inconsistency would be on marker No. 6, which gave me an additional column, and I broke it down. I had just the letters 'H' or 'S' to the left of this initial column here, and that indicated to me that the 'H' was Hialeah and the 'S' would be Santa Anita. It would just be a classification of the two tracks. Where no 'S' was placed, why—it is common practice with bookmakers, and betting markers, if it is the local track, well they don't indicate by name the local track. If it is an out-of-state track,

they indicate by an initial or some symbol that it is a track out of the state. And that is about the only variation I found among these six markers"; "on one of these I found a 9th race. Now, Santa Anita only has 8 races, but Hialeah or the Fair Grounds does have a 9th race, and in checking that out I found that; I don't know whether I can dig that marker up or not, but I did find I had nine races going at Hialeah, so again that was what might have been my only stumbling block in the code and it clarified itself"; I did not "find any number in the second numbers which was larger than the number of horses entered in the particular race"; my "decoding of this and the result and figures were consistent with one of the forms of keeping books used by bookmakers in this county."

On cross-examination Officer Marshall testified: When I entered the premises on February 16, 1955, I did not know what the symbols meant; I had never "seen this particular code used in a bookmaking operation"; "I didn't know the meaning of this particular set of symbols at this time"; defendant showed me "one code which referred to numbers of magazines being returned to dealers" which were symbols of some kind which he explained; I did not see anyone making a bet; I did not see any "owe sheets" on the premises; an owe sheet "is the record of the money coming to a better, or that the better owes the book"; "a person who accepts wagers, or makes wagers, ordinarily consults a scratch sheet to see if a particular horse has been scratched"; a person who is accepting bets on horse races should check to see if "he" [the horse] has been past posted; when a horse is scratched from a race it eliminates a post position; there was no racing digest or parlay book in the rear room; there was no date on any of the slips of paper; it is "customary for a person who occupies premises for the purpose of taking wagers on horses to have some record regarding the results of the races or the disposition made of a particular bet"; I cannot say that any particular person placed a bet on defendant's premises; "Q. And you don't know whether or not any of the people who went into the premises on the date you had it under surveillance made a bet there, do you, sir? A. Not any of those particular persons; no"; defendant cooperated fully when we came in and started to search the premises; I do not know when or where any of these writings were made; I do not know whether anyone placed a bet on February 16, 1955, or whether defendant accepted or regis-

tered any bet on that date; defendant told me the slips were in his handwriting; I suppose a code of this kind could be applied "to a business operation, or purchases, and so forth." Defendant did not testify or offer any evidence in his behalf.

The only assigned error is refusal of the court to give two instructions requested by defendant on the subject of circumstantial evidence.[1] The argument is that the case made by the People rested chiefly on circumstantial evidence and in such a case it is prejudicial error to refuse the instructions.

The People concede that with respect to the charge in Count I, keeping and occupying the premises for the purpose of recording a bet or bets, the evidence was entirely circumstantial and that it was error to refuse the instructions as to that count. They urge the error was not prejudicial. With respect to the charge in Count II, recording a bet or bets, the People contend the evidence was not chiefly circumstantial, that the opinion evidence of the expert on bookmaking was direct evidence, and there was no error in refusing the instructions as to that count.

When the case which has been made out by the People against a defendant rests entirely or chiefly on circumstantial evidence, and in any case before the jury may find a defendant guilty, basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt. In a criminal case the trial court is required to instruct the jury of its own motion on the law relating to the facts of the case and on matters vital to a proper consideration of the evidence. (*People* v. *Buffum,*

---

[1]The refused instructions were: "If the evidence in this case [as to any particular count] is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt.

"You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilt."

"Where the guilt of the defendant is predicated upon circumstantial evidence, the character of evidence must *be* not only be consistent with the hypothesis of guilt but inconsistent with any rational hypothesis of innocence."

40 Cal.2d 709, 724 [256 P.2d 317].) In *People* v. *Yrigoyen*, 45 Cal.2d 46 [286 P.2d 1], the rule is stated (p. 49):

"In accordance with this rule we declared in *People* v. *Bender*, 27 Cal.2d 164, 174 et seq. [163 P.2d 8], that the court on its own motion must give an instruction embodying the principle that to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion. (See also *People* v. *Koenig*, 29 Cal.2d 87, 93 [173 P.2d 1].) It is true that in the Bender case proof of guilt was entirely circumstantial, whereas in the present case there was direct evidence that defendant issued the check without sufficint funds in or credit with the bank, and circumstantial evidence was relied upon to show his criminal knowledge and intent. However, in the Bender case, it is stated that where circumstantial evidence is substantially relied upon for proof of guilt, adequate instructions on the rules governing the application of such evidence must be given. (27 Cal.2d at p. 175.) And it has been held that the instruction must be given where criminal knowledge is shown only by circumstantial evidence. (*People* v. *Candiotto*, 128 Cal.App.2d 347, 355-356 [275 P.2d 500].)" (Also see *People* v. *Hatchett*, 63 Cal.App.2d 144, 155 [146 P.2d 469].)

"Direct evidence is that which proves the fact in dispute, directly, without an inference or presumption, and which in itself, if true, conclusively establishes that fact." (Code Civ. Proc., § 1831.) "Indirect evidence is that which tends to establish the fact in dispute by proving another, and which, though true, does not of itself conclusively establish that fact, but which affords an inference or presumption of its existence." (Code Civ. Proc., § 1832.) ▮▮ The terms "indirect evidence" and "circumstantial evidence" are interchangeable and synonymous. (18 Cal.Jur.2d 434, § 12.) ▮▮ Direct evidence is that which is applied to the fact to be proved, immediately and directly, and without the aid of any intervening fact or process: as where, on a trial for murder, a witness positively testifies he saw the accused inflict the mortal wound, or administer the poison. ▮▮ Circumstantial evidence is that which is applied to the principal fact, indirectly, or through the medium of other facts, from which the principal fact is inferred. ▮▮ The characteristics of circumstantial evidence, as distinguished from that which is direct, are, first, the existence and presentation of one or

more evidentiary facts; and, second, a process of inference, by which these facts are so connected with the fact sought, as to tend to produce a persuasion of its truth. (Burrill on Circumstantial Evidence, 4, 5.) ■ An inference is a conclusion as to the existence of a material fact that a trier of fact may properly draw from the existence of certain primary facts. (*Blank* v. *Coffin*, 20 Cal.2d 457, 460 [126 P.2d 868].) ■ Inferences drawn from physical facts amount to circumstantial evidence. (*McCready* v. *Atlantic Coast Line R. Co.*, 212 S.C. 449 [48 S.E.2d 193, 196].) It has been said that circumstantial evidence, as distinguished from direct evidence, is testimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved. (*Aday* v. *State*, 28 Okla.Crim. 201 [230 P. 280, 281].)

The court in *People* v. *Barnhart*, 66 Cal.App.2d 714 [153 P.2d 214], treated as circumstantial evidence testimony of police officers relative to the modus operandi of bookmakers and the opinions of the officers with respect to papers found in the possession of the defendant, similar to the testimony of Officer Marshall in the case at bar. Also in *People* v. *Levene*, 107 Cal.App.2d 125 [236 P.2d 604], a bookmaking case, the court clearly implied that the testimony of a police officer as an expert with respect to the bookmaking character of sheets of paper found in a room occupied by the defendant was circumstantial evidence, and said that an instruction thereon should have been given. *People* v. *Jones*, 42 Cal.2d 219 [266 P.2d 38], held that expert testimony that the defendant was not a sexual deviate is circumstantial evidence. The court said such evidence was analogous to evidence as to the character of the accused and, quoting Wigmore, that one of its purposes was "to base thereon a probable presumption that he would not be likely to commit, and, therefore, did not commit, the crime with which he is charged." In *People* v. *Zerillo*, 36 Cal.2d 222 [223 P.2d 223], the court held the opinion of a chemist concerning the purity of tomato paste was circumstantial evidence. In *Estate of Reed*, 132 Cal.App.2d 732 [285 P.2d 935], this court characterized the testimony of a handwriting expert as "indirect evidence." *Wakeley* v. *State*, 118 Neb. 346 [225 N.W. 42], a prosecution for forgery, held that the opinion of an expert on handwriting derived from a comparison of writing of the defendant and the writing in question is circumstantial evi-

dence. (To same effect, *In re Parvin's Estate*, 131 Neb. 853 [270 N.W. 470, 472].) In *In re Trope's Estate*, 190 Okla. 453 [124 P.2d 733], it was held that reputation evidence that parties are living together as husband and wife constitutes circumstantial evidence that they are living together under a marriage contract. In *Lynn* v. *State*, 119 Ark. 880 [277 S.W. 19], it was held the testimony of officers that mash which they found in defendant's potato patch was fresh mash suitable for distillation of alcoholic liquor was circumstantial evidence. *State* v. *Martinez*, 52 N.M. 343 [198 P.2d 256], says that the opinion of a ballistic expert that the death bullet was fired from the defendant's gun was ''an evidentiary fact and a link in the chain of facts from which the jury could determine that the defendant was guilty of murder.'' Wharton in his latest work on Criminal Evidence labels opinion evidence as to fingerprints, palm prints, and tracks as circumstantial evidence. (3 Wharton's Criminal Evidence, 12th ed., (1955) 479, § 982.) (Also see Taylor on Evidence, 12th ed., §§ 65, 1416 et seq.)[2] Any implication in *People* v. *Pedroza*, 125 Cal.App.2d 144 [269 P.2d 921], that the opinion of an expert is direct evidence of the ultimate fact to be proved, is out of line with the authorities to which we have referred.

 We are of the view that the testimony of Officer Marshall as an expert was circumstantial evidence. He testified to his opinion relative to the character of the six pieces of paper found in defendant's newsstand. From that opinion, together with the other evidence in the case, the jury was asked to infer the ultimate fact that defendant occupied the newsstand with paraphernalia for the purpose of recording bets. The case of the People rested chiefly on

---

[2]In *Barker* v. *Gould*, 122 Cal. 240 [54 P. 845], the court stated (p. 243): ''There was no evidence of any visible or open flow of water from the creek to the tunnel, but the defendants sought to establish the fact by means of expert testimony, based upon the geological formation of the surrounding country, the direction and angle of dip of the strata, the character of rock in the different strata, and the character of the intervening seams. . . . The conclusion of each expert witness was but an opinion formed by him from his knowledge of the science applicable to the subject matter of the investigation, and his capacity for forming his opinion, as well as the value to which the opinion was entitled, depended upon the extent of his studies and of his experience in reference to that subject, and also upon the extent to which he had applied the knowledge thus acquired by him to this particular subject. His testimony was not of a fact, but was merely his deduction from other facts under the theory adopted by him, as the result of his previous studies and experience.''

circumstantial evidence and it was error to refuse to give the requested instructions as to both counts. The question is, was the error prejudicial. We think it was not.

The evidence points convincingly to the guilt of defendant. Within a period of two and one-quarter hours on February 16, 1955, 8 to 10 persons went into defendant's newsstand, did not stop in the front room but went into the rear room. Defendant immediately followed each one into that room. He returned to the front room 10 or 15 seconds later, each time putting his pen into his shirt pocket. The other person immediately left the premises. No one of the 8 to 10 persons made a purchase. The only window in the rear room was covered by a green shade. Shortly after 2 p. m. that day the officers found six betting markers with a series of letters written on them, all in defendant's handwriting, in the rear room. All the betting markers, with one exception, were written with ink; the one exception was written partly with ink and partly with a pencil. When asked what they were, defendant replied they were a form of double bookkeeping for tax evasion purposes, and when asked to explain, said, "I can't; you will have to talk to my lawyer." The officers found a newspaper of February 16, 1955, open to the entries "at the current tracks" in the rear room. The betting markers showed bets on horses running at Santa Anita and Hialeah on February 16, 1955. Defendant had it in his power to explain all of these circumstances. He did not. ■ "[T]he failure of the defendant to deny or explain evidence presented against him, when it is in his power to do so, may be considered by the jury as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable." (*People* v. *Adamson,* 27 Cal.2d 478, 489 [165 P.2d 3].) ■ The fact that all the evidence was circumstantial does not lessen its weight, for circumstantial evidence is as adequate to convict as direct evidence. (*People* v. *Koenig,* 29 Cal.2d 87, 91 [173 P.2d 1].) That the officers did not observe any activity in the rear room, did not know who any of the persons were who went into that room, that the six papers were not dated, that neither "owe sheets" nor a "scratch sheet" were found on the premises, that no one saw anyone place a bet, and that Officer Marshall supposed a code of the kind indicated by the six papers could be applied "to a business operation, or purchases, and so

forth," do not weaken the force of the evidence on which the verdict rests.

The offense charged in Count I was complete when it was shown that the accused occupied a place with paraphernalia for the purpose of registering bets on February 16, 1955. The offense denounced is the occupancy of the place with the necessary equipment for registering bets, not the actual taking of bets. (*People* v. *Barnhart*, 66 Cal.App.2d 714, 721 [153 P.2d 214].) The evidence to the effect that the notations on the slips of paper, admittedly in the handwriting of defendant, were records of bets on horses which ran on February 16, 1955, together with the other circumstances related, established that defendant registered bets on that day.

There is no doubt the jury was justified in concluding that defendant was guilty as charged in both counts. We are satisfied that if the instructions had been given the result would have been the same. The evidence of defendant's guilt is so clear we cannot hold the failure to give the requested instructions to be reversible error. (*People* v. *Levene*, 107 Cal.App.2d 125 [236 P.2d 604] ; *People* v. *Tenedor*, 107 Cal. App.2d 581, 584 [237 P.2d 679].)

The judgment and the order denying a new trial are affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied February 24, 1956, and appellant's petition for a hearing by the Supreme Court was denied March 8, 1956.