Filed 9/20/13  P. v. Vaughan CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047263 |
| v. | (Super. Ct. No. 02WF1202) |
| BRIAN FRED VAUGHAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Following a jury trial, the trial court extended appellant's involuntary commitment as a mentally disordered offender (MDO). Appellant contends reversal is required because the trial court failed to instruct the jury on the permissible use of circumstantial evidence and improperly shifted the burden of proof on his medication defense. He also contends the court erred in denying his request for outpatient treatment. Finding no basis to reverse, we affirm the judgment.

FACTS

On May 25, 2002, Albert Harnder withdrew $40 from an ATM in Huntington Beach. As he was walking away, appellant grabbed him from behind and pressed a screwdriver against his back. He told Harnder he would kill him if he didn't give him the money. Harnder offered the money to appellant and told him to take it, but before appellant could do so, security guards arrived on the scene and detained him.

Appellant pleaded guilty to attempted robbery with a deadly weapon and making a criminal threat. While he was in prison, he was prone to agitated and angry outbursts and once threw a trash can at a guard. He also insisted the food was poisoned and he had discovered a cure for AIDS.

Following his parole in 2008, appellant lived with his mother. One day, they got into a disagreement, and appellant became violent. Appellant's parole officer was summoned, and when he arrived he noticed appellant's mother had a black eye. She reported appellant had choked her until she had become unconscious.

As a result of that incident, appellant's parole was revoked and he was returned to prison. In December 2010, he was committed to Atascadero State Hospital (Atascadero) as an MDO, and in January 2012, the state petitioned to extend his commitment. Appellant opposed the petition, in July 2012, trial on the matter began.

Dr. Phillip Kelly, a staff psychiatrist at Atascadero, testified he evaluated appellant on November 17, 2011. Based on the evaluation, as well as appellant's records, he determined appellant suffers from schizoaffective disorder, bipolar type, which is a

2

severe mental disorder. The disorder causes appellant to exhibit "thought disorder symptoms," such as delusions, hallucinations and paranoia. There are times when he hears voices in his head, and sometimes he feels everyone is out to get him. He has reported seeing dead people.

Appellant's mental disorder also causes "mood symptoms," such as depression, agitation, irritability and anger. Because appellant is bipolar, his symptoms are not always present. Rather, they tend to "wax and wane" over time. Dr. Kelly explained that's "just part of [appellant's] illness. That's what mood disorders do." That's also what makes appellant's condition very difficult to treat.

As part of his treatment plan, appellant has been prescribed a variety of antipsychotic and antidepressant drugs. He also has a prescription for Lorazepam, a sedative, which he is supposed to take "as-needed." Dr. Kelly testified these medications are generally effective in controlling appellant's symptoms. However, appellant has not always taken them on a consistent basis. While he is inclined to ask for them and take them when he is feeling bad, he tends not to do so when he is feeling good. And when he stops taking them, that makes his symptoms worse, increasing the risk he will engage in violent behavior. He has refused medication on several occasions, most recently in June 2011.

Over all, however, appellant has made good progress since arriving at Atascadero. He has been cooperative and well behaved, participated in his treatment programs and worked a variety of jobs. In speaking with Dr. Kelly, he seemed to understand there is a positive correlation between taking his medication and his mental health. Yet he also tended to minimize some of his symptoms and past behavior. For instance, he blamed his commitment offenses on drug use and claimed his mother only had a "spot on her neck" after he assaulted her, which was not true. And although appellant said he felt much better now than in the past, he did express a paranoid ideation

3

about "people defeating him."  Still, at the time he evaluated appellant in November 2011, Dr. Kelly felt his mental illness was pretty much under control.

However, by the time of trial, eight months later, Dr. Kelly's opinion about appellant had changed.  In reviewing appellant's records during the interim, he noticed appellant's attendance at his various treatment groups had dropped off sharply, to about 50 percent.  Also, during a May 2012 interview with the staff at CONREP, a conditional release program, appellant insisted he did not have a mental illness and did not need his medication.  Thus, the staff did not believe appellant was suitable for their program.  Appellant has also told staff at Atascadero he does not think he needs to take his medication.

Dr. Kelly testified appellant has always been somewhat ambiguous about his mental illness and need for treatment.  He's often complained his medications make him tired, and he would be better off without them.  But Dr. Kelly disputed this.  He believed the cause of appellant's tiredness was his depression, not his medication, and his failure to realize this was proof he lacks insight into his condition.  Dr. Kelly also expressed concern about appellant's lack of coping skills and a solid outpatient plan.  He did not believe appellant could safely transition into the community on his own.

Testifying further, Dr. Kelly opined appellant's mental illness was not currently in remission, as reflected by the continued presence of his symptoms.  Nor could he ever get his illness under control if he did not take his medication on a regular basis.  Asked what he thought would happen if appellant were released into the community, Dr. Kelly surmised he would not take his medication, which would cause his symptoms to increase, and he would become violent.  Therefore, Dr. Kelly believed appellant met the criteria for continued confinement at Atascadero as an MDO.  While conceding appellant is considered a "low risk" for engaging in assaultive behavior at Atascadero, Dr. Kelly felt that without a structured support system, he would pose a substantial risk of physical harm to others.

4

Dr. Veronica Thomas echoed Dr. Kelly's opinions in this regard. A psychologist in private practice, she examined appellant while he was in jail before trial. Although appellant was polite and cooperative during the interview, he said he gets "zombified" when he's on his medication and it seems to "rain more" when he doesn't. His chart also showed he had "elements of ongoing delusions," indicating to Dr. Thomas that his mental illness was not in remission. Moreover, Dr. Thomas felt appellant was not entirely forthright about the prevalence of those delusions. She stated, "[T]here's a secretive and paranoid component [to appellant] that suggests he's not at a place yet where he [has a] good grip of his severe mental illness."

Dr. Thomas explained appellant's records show he goes "back and forth" in terms of "accepting and rejecting the concept that he has a severe mental illness that requires treatment," and there have been periods when he has refused to take his medication altogether. At times, appellant has recognized he needs treatment for his mental illness, but in July 2011, about a year before trial, he stated, "They're all crazy." "There's nothing wrong with me." Dr. Thomas said this shows appellant "is ambivalent and doesn't quite understand or accept the magnitude of [his] mental illness." In particular, he doesn't understand how his mental illness affects his behavior. Thus, Dr. Thomas did not believe appellant was suitable for outpatient treatment.

In Dr. Thomas' opinion, this lack of insight also makes appellant a threat to others. While appellant has not been violent at Atascadero, Dr. Thomas was concerned that, outside that setting, he would not do well because he does not fully understand his condition or appreciate the need to stay on his medication. In fact, appellant told her that he could manage his symptoms without his medication, just by asking people around him for help and staying away from alcohol and street drugs. However, Dr. Thomas felt that if appellant stopped taking his medication, his symptoms would increase and there would be a greater likelihood of him using those substances. And if he did that, his symptoms "would probably increase dramatically," making him a serious danger to others.

5

Testifying on his own behalf, appellant stated he has suffered from depression for about 10 years and was diagnosed with bipolar schizoaffective disorder in 2010. However, he stated there are times when he feels he is not mentally ill. It depends on how he is feeling; sometimes he feels "really good," and sometimes he feels "really the opposite." When he's feeling "the opposite," he gets tired and fatigued. His symptoms also include "occasional voices, occasional hallucinations, insomnia," loss of appetite and mood fluctuation. And when he is experiencing those symptoms, he is not always aware they are the product of his mental illness.

Appellant testified he doesn't remember much about his commitment offenses back in 2002. He said he was under the influence of methamphetamine at the time, and the whole episode seems like a dream to him now. Back then, he was having "extreme paranoid thoughts" and visual hallucinations and voices were telling him to break the law. He followed the voices and ended up going to prison as a result of what he did. While in custody, he felt like bugs were crawling all over him and people were trying to take his tears and his feces. He also told prison officials he had a highly-contagious disease that would shut down the prison.

Appellant testified he also has a hard time remembering when he attacked his mother in 2010. In the wake of the attack, after she called his parole officer, he felt like she was betraying him for wanting to send him back to prison. He also felt like she was the one who was mentally ill, not him. He admitted he sometimes has a hard time telling the difference between what is real and what is not.

When appellant was initially admitted to Atascadero in December 2010, he didn't want to eat the food because he thought it was contaminated. There have also been times when he did not want to take his medication because it makes him tired and gives him migraines. In February 2011, he told his psychiatrist the more medications he takes, the more homosexuals "were walking in the door." In addition, he has told staff that sometimes he hears voices telling him not to take his medication. Appellant has also

6

asserted the belief that lack of education is the cause of his symptoms, and they can be sufficiently controlled by therapy, exercise and eating right.

Nevertheless, appellant conceded at trial that when he stops taking his medication, his condition worsens. He said he may feel better for awhile, but then he gets headaches, insomnia and becomes emotionless, like he's "numb." Therefore, if he were released from Atascadero, he would take his medication regularly. Although he doesn't believe in medication, it usually makes him feel better when he takes his pills, and the benefits are worth the negative side effects. He said he now understands that medication is an essential component of his treatment regimen. However, he admitted he hasn't always been honest with his doctors, and sometimes he simply tells them what they want to hear.

Appellant also admitted he sometimes forgets to take his medication, and he has to be reminded to do so. Moreover, his medication isn't always 100 percent effective. In fact, even though he was on his medication at the time of trial, he felt the symptoms of his mental illness two days before he testified. He conceded, "The medication doesn't work all the way all the time. It helps for . . . most of the symptoms [but] [i]t doesn't help all of them."

For example, in November 2011, appellant had a hallucination about zombies, even though he was on his medication. And in the spring of 2012, in the months leading up to trial, he was experiencing difficulty sleeping, racing thoughts and rapid speech. He also reported hearing voices in his head. At trial he described the voices as fast and scrambled and said they don't have any meaning to him.

Explaining what he would do if he were released from Atascadero, appellant said he would try to get into an outpatient treatment program or possibly live with his mother. She could help him pay for his medication, but he would also look for work and try to keep himself occupied. Getting a job, going back to school, and attending substance abuse classes are all things he would like to do. His ultimate goal is

to live independently and not have to take any medication. However, he understands the need to do so and will take his medication as long as his doctors tell him to. Although he has acted violently in the past, he does not think he is currently a danger to society.

In closing argument, appellant's attorney argued appellant could keep his mental illness under control by taking his medication and thus he was not a threat to others. However, the jury found appellant met the criteria for commitment as an MDO, in that he 1) has a severe mental disorder; 2) his disorder is not in remission or cannot be kept in remission without treatment; and 3) by reason of his disorder, he represents a substantial danger of physical harm to others. Thereupon, the court extended appellant's commitment for one year.

I

Appellant contends the trial court erred in failing to instruct the jury sua sponte with CALCRIM Nos. 223 and 224. Respondent concedes the error but claims it was harmless. We agree with respondent.

CALCRIM No. 223 explains the difference between direct and circumstantial evidence, and CALCRIM No. 224 provides that if two or more reasonable conclusions can be drawn from circumstantial evidence, the jury must accept the one that points in favor of the defendant. However, the instruction also states the jury must accept only reasonable conclusions and reject those that are unreasonable.

In this case, neither side requested that CALCRIM Nos. 223 and 224 be given. While initially stating he was going to give the instructions anyway, the trial judge eventually changed his mind. In the end, he decided not to give them because he felt they would confuse the jury and the case was really more about credibility than circumstantial evidence.

However, as the Attorney General concedes, CALCRIM Nos. 223 and 224 should have been given sua sponte because expert testimony is generally considered to be circumstantial evidence (*People v. Jones* (1954) 42 Cal.2d 219, 222; *People v. Gentry*

8

(1968) 257 Cal.App.2d 607, 611), and the instructions apply in civil commitment proceedings (*People v. Contreras* (2010) 184 Cal.App.4th 587; *Conservatorship of Walker* (1987) 196 Cal.App.3d 1082). The only question is whether the failure to give them was prejudicial, i.e., whether it is reasonably probable appellant would have obtained a more favorable verdict had CALCRIM Nos. 223 and 224 been given. (*People v. Johnwell* (2004) 121 Cal.App.4th 1267, 1274-1275; *People v. Goldstein* (1956) 139 Cal.App.2d 146, 156.) Considering this question in light of the issues and evidence presented, we believe the answer is no.

The first issue the jury had to decide, whether appellant suffers from a severe mental disorder, was not in dispute. Even appellant admitted he suffers from schizoaffective disorder, bipolar type, which qualifies as such a disorder.

The second issue, whether the disorder was in remission and whether it could be kept in remission without continued treatment, was in dispute. But those issues turned largely on direct evidence. For example, appellant's failure to take his medication and attend his treatment programs was direct evidence he was not following his treatment plan, and the fact he was having hallucinations, delusions and other symptoms up until the time of trial was direct evidence his disorder was not in remission. Therefore, the instructions on circumstantial evidence would not have had much bearing on the second issue before the jury.

The third issue, in contrast, did depend primarily on circumstantial evidence. The jury had to decide, based on everything they knew about appellant, whether he posed a substantial risk of physical harm to others. Despite the unanimous expert testimony on this issue, appellant claims it is unlikely the jurors would have found this element true had they been instructed to interpret the circumstantial evidence in his favor. However, under CALCRIM No. 224, a jury is only required to construe circumstantial evidence in the defendant's favor when two or more *reasonable*

9

conclusions can be drawn from the evidence. That is not the case with respect to the issue of appellant's dangerousness.

Within the last 10 years leading up to trial, appellant attempted to commit robbery with a screwdriver, he gave his mother a black eye, and he choked her to the point she became unconscious. He was unruly, paranoid and delusional in prison, and his mental illness did not relent following his commitment as an MDO. While his behavior improved at Atascadero, his symptoms and mental state "waxed and waned" with time. This created a dangerous cycle in which appellant tended to scorn his medication when he felt good, but by going off his medication, he virtually guaranteed he would decompensate, due to the up and down nature of his disorder. It was quite clear from the evidence that appellant needed to follow his treatment plan *all the time*. However, history shows that would be a tall order for him, especially if he was on his own.

Appellant testified that if he were released from Atascadero, he would in fact take his medication. However, he also stated that he really doesn't believe in the concept of medication and that he thinks his symptoms can be controlled without it. Also, when his symptoms do appear, he is not always aware of their cause. They distort his sense of reality, and he has difficulty knowing what is real and what is not. And sometimes he hears voices in his head that tell him not to take his medication and to do bad things. The danger, of course, is that appellant could easily be overcome with his delusional thoughts and act on them, just as he did during his prior episodes of violent behavior.

It is certainly true that appellant has had periods of good behavior and full compliance with his treatment plan. But the nature of his mental illness is such that it will never go away completely. Even during the "good times," appellant must remain vigilant to prevent a meltdown when things turn dark. Appellant's admissions that he sometimes forgets to take his medication and that he thinks his illness can be controlled without it is strong evidence he remains a serious danger to society.

10

The efficacy of appellant's medicine is also a legitimate concern. Appellant testified his medication is not always effective, and despite being on it at the time of trial, he was still experiencing symptoms of his disorder. So, there is a very real danger appellant could decompensate and become violent, even if he were to continue to comply with his medication regimen.

Of course, all of appellant's challenges would likely be much greater if he were not receiving around-the-clock supervision from mental health professionals and instead had to fend for himself in the outside world. The expert witnesses were very clear on this point, and they also were unanimous in their opinion that appellant would have serious difficulty controlling his mental disorder if he were released from Atascadero. Given appellant's history, it is simply not reasonably likely he would have obtained a more favorable verdict had the jury been instructed on circumstantial evidence. Therefore, the failure to give CALCRIM Nos. 223 and 224 was harmless.

II

Appellant also contends the trial court improperly shifted the burden of proof with respect to his so-called "medication defense." This claim also fails.

On appeal, we consider the trial court's instructions as a whole and in favor of the judgment below. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.) We also "'"assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]"' [Citation.]" (*Id.* at p. 1111.) If the record shows the jury was properly instructed on all elements of the state's case, we reverse only if there is a "'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)

Here, the jury was properly instructed on the elements of the state's case. To wit, the trial court instructed, "The petition alleges [appellant] is a mentally disordered offender. [¶] To prove this allegation, the petitioner must prove beyond a reasonable

11

doubt that: [¶] One, he has a severe mental disorder; [¶] Two, the severe mental disorder is not in remission or cannot be kept in remission without continued treatment; and [¶] Three, because of his severe mental disorder, he presently represents a substantial danger of physical harm to others."

In addition, the trial court instructed the jury that remission means the symptoms of the severe mental disorder are controlled by medication or psychosocial support. And, a severe mental disorder cannot be kept in remission without treatment if, within a year of trial, the person engaged in violent or threatening behavior or did not voluntarily follow his treatment plan.

Consistent with appellant's defense, the trial court also instructed the jurors, "*If you find [appellant] is in remission and thus not dangerous to others while medicated*, the petitioner has the burden to prove, beyond a reasonable doubt, that, if released, [appellant] will not take his . . . prescribed medication and in an unmedicated state [he] represents a substantial danger of physical harm to others."

Appellant argues inclusion of the italicized phrase shifted the burden to him to prove his mental disorder was in remission. But the phrase does not so state, and nothing about it suggests that. It speaks to the issue of remission, and the court specifically instructed *the state* had the burden to prove beyond a reasonable doubt that appellant's mental disorder was not in remission or cannot be kept in remission without continued treatment. This instruction immediately preceded, and was given in conjunction with, the challenged instruction on appellant's medication defense. Moreover, state's counsel readily conceded in closing argument that she had the burden to prove appellant's mental disorder was not in remission. Under these circumstances, it is not reasonably likely the jury shifted that burden to appellant. The instructions simply do not lend themselves to such a construction when considered as a whole.

12

III

Lastly, appellant contends the trial court erred in denying his request to be transferred to an outpatient treatment program. He argues the court applied the standard of proof incorrectly, and its decision is not supported by substantial evidence, but the record shows otherwise.

Following the jury's verdict, the trial judge issued a lengthy ruling on appellant's request to be released into the CONREP program. He explained, "I have read [*People v. Gregerson* (2011) 202 Cal.App.4th 306 (*Gregerson*)], and all along it was my impression that this was a reasonable cause standard, fairly low standard, to obtain outpatient treatment. [¶] [Appellant] must raise a strong suspicion in a person of ordinary prudence that outpatient treatment would be safe and effective. And that's the way I've been looking at it throughout the trial, asking myself, do I have a strong suspicion that outpatient treatment would be safe and effective? I don't need to have clear and convincing evidence of that point. I don't even need to have a preponderance of the evidence on that point.

"And this standard, as I understand it, is less than preponderance of the evidence. It's very much like the standard that the court [utilizes] in a preliminary examination. And as I said, all along that's been what I've been thinking about. [¶] I am going to deny the request for outpatient treatment or CONREP or community treatment. I simply don't have that strong suspicion. In fact, I strongly suspect that it would not be safe and effective."

In so ruling, the judge surmised appellant might be suitable for outpatient treatment at some point, but, like Dr. Thomas, the judge did not believe appellant was ready for CONREP at this time. While recognizing appellant was "well motivated" and had "made great strides" at Atascadero, the judge felt his condition was "too fragile" to change his placement. Particularly, the judge was concerned "that in community confinement there would be less supervision and a likelihood that when [appellant] feels

13

better, he will decide that he doesn't need the medication. . . . [A]nd that then he will present very differently than he does today and become agitated and possibly act out."

Appellant concedes the trial judge articulated the correct legal standard of reasonable cause in denying his request for outpatient care. That is, the judge correctly determined appellant had the burden to raise a strong suspicion he could be safely and effectively treated on an outpatient basis. (Pen. Code, § 2972, subd. (d); *Gregerson, supra*, 202 Cal.App.4th at pp. 316-319.) However, appellant argues the court "misunderstood" that standard in applying it to the facts, and properly understood, the standard compels reversal of the court's ruling.

In so arguing, appellant contends that just because the judge strongly suspected he could not be safely and effectively treated at CONREP, there was still room for him to entertain a strong suspicion that he could. In other words, the presence of some evidence of nonsuitability does not necessarily mean there was not some evidence of suitability. However, the question was not whether there was "some evidence" appellant was suitable for outpatient treatment. Rather, appellant had to "raise a strong suspicion in a person of ordinary prudence that outpatient treatment would be safe and effective" for him. (*Gregerson, supra*, 202 Cal.App.4th at p. 319, fn. omitted.) By stating he *strongly* suspected outpatient treatment would *not* be safe and effective for appellant, the judge impliedly found appellant failed to carry his burden of proof in that regard. And to make the matter perfectly clear, the judge stated, "I simply don't have [a] strong suspicion" that outpatient care would be safe and effective for appellant. We are convinced by this that the judge applied the correct standard of proof in denying appellant's request.

The record also contains substantial evidence to support the trial court's ruling. (See *Gregerson, supra*, 202 Cal.App.4th at pp. 319-320 [substantial evidence standard applies in reviewing trial court's ruling on request for outpatient treatment].) As to that issue, appellant plays up all the evidence that was favorable to him at trial. But in

14

applying the substantial evidence rule, we presume "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Reversal is not warranted unless upon no hypothesis whatsoever is there substantial evidence to support the ruling below. (*People v. Gaut* (2002) 95 Cal.App.4th 1425, 1430.)

At trial, Dr. Kelly testified appellant's failure to follow his treatment plan caused the CONREP staff to have concerns about accepting him into their program. In fact, when the staff interviewed appellant shortly before trial in May 2012, he told them he did not have a mental illness and did not need any medication. Dr. Kelly said this lack of insight was a troubling theme of appellant's mental illness. And Dr. Thomas went so far as to say that appellant's enduring ambivalence about his mental illness made him unsuitable for CONREP at this time. She opined, "[T]here's a secretive and paranoid component [to appellant's thinking] that suggests that he's not at a place yet where he [has a] good grip of his severe mental illness."

Based on this evidence, the trial judge could reasonably find appellant was not a suitable patient for CONREP. There is substantial evidence to support the judge's decision to deny appellant's request for outpatient treatment.

DISPOSITION

The judgment is affirmed.

BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.

15